**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DAVID ROBERTSON, and** | ) | **JURY DEMAND** |
| **DANIEL RODNI,** | ) | |
| | ) | **Case No. 3:23-cv-00770** |
| **Plaintiffs,** | ) | |
| | ) | **Judge: Campbell** |
| **v.** | ) | |
| | ) | **Magistrate: Holmes** |
| **RYAN UPCHURCH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

# PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

---

Respectfully submitted,

/s/ Christopher Smith

DRS LAW

Christopher Smith, BPR #034450
David Randolph Smith, BPR #011905
Dominick R. Smith, BPR #028783
David Anthony Smith BPR #041695
1913 21st Avenue South
Nashville, Tennessee 37212
Phone: 615-742-1775
Fax: 615-742-1223

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................................ 1

II. LEGAL STANDARD ................................................................................................................... 2

A. Rule 50(b) Requires Extreme Deference to the Verdict. .................................................................... 2

B. A Renewed Motion Cannot Expand the Grounds Raised Before the Case Went to the Jury. ............ 3

III. ARGUMENT ............................................................................................................................. 4

A. A Reasonable Jury Could Find the Statements Were "Of and Concerning" Both Plaintiffs. ............. 4

B. The Opinion/Hyperbole Argument Fails on the Merits. ..................................................................... 7

C. The Jury's Clear-and-Convincing Malice Finding Is Supported by the Record. .............................. 10

D. The Intentional Infliction Claim Rests on Targeted, Individualized Conduct That *Snyder* Does Not Immunize............................................................................................................................. 12

E. Daniel Rodni's Claims Rest on a Developed, Independent Record. ................................................ 14

F. The Jury Instructions, Considered as a Whole, Fairly Stated the Law. ............................................ 15

G. The Admission of Additional Videos Was Not an Abuse of Discretion, and Any Error Was Harmless.............................................................................................................................. 17

H. The Compensatory Award Rests on Three Distinct, Well-Supported Categories of Harm, and Any Remittitur Should Be Modest. ........................................................................................... 18

IV. CONCLUSION ......................................................................................................................... 23

## TABLE OF AUTHORITIES

### Cases


*Beard v. Norwegian Caribbean Lines*, 900 F.2d 71 (6th Cir. 1990) ....16

*Blatty v. New York Times Co.*, 42 Cal. 3d 1033 (1986) ....4

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ....22

*Compuware Corp. v. Moody's Inv. Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007) ....8

*Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990) ....21

*Gregory v. Shelby Cnty.*, 220 F.3d 433 (6th Cir. 2000) ....20

*Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767 (6th Cir. 2020) ....1

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ....10

*Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816 (M.D. Tenn. 2021) ....7

*Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234 (Cal. Ct. App. 2017) ....12

*Jolliff v. NLRB*, 513 F.3d 600 (6th Cir. 2008) ....8

*Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320 (6th Cir. 2017) ....1

*Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004 (6th Cir. 1987) ....15

*Lloyd v. Greater Cleveland Reg'l Transit Auth.*, No. 1:18-cv-01557, 2022 WL 1028121 (N.D. Ohio Apr. 6, 2022) ....21

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ....8

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ....7

*Mullins v. Brando*, 91 Cal. Rptr. 796 (Cal. Ct. App. 1970) ....4

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ....1

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ....23

*Sanders v. Walsh*, 162 Cal. Rptr. 3d 188 (Cal. Ct. App. 2013) ....9

*Sandmann v. New York Times Co.*, 78 F.4th 319 (6th Cir. 2023) ....8

*Snyder v. Phelps*, 562 U.S. 443 (2011) ....12

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ....11

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ....22

*Stockenhauer v. Sigman*, No. 97-CV-70619-DT, 2005 WL 2346294 (E.D. Mich. Sept. 24, 2005) ....16

*Wallace v. FedEx Corp.*, 764 F.3d 571 (6th Cir. 2014) ....20

*Yow v. National Enquirer, Inc.*, 550 F. Supp. 2d 1179 (E.D. Cal. 2008) ....4


### Rules

Fed. R. Civ. P. 50(a) ....................................................................................................... 1
Fed. R. Civ. P. 50(b) ....................................................................................................... 1
Fed. R. Civ. P. 61 ....................................................................................................... 17

## I. INTRODUCTION

A unanimous jury found Defendant Ryan Upchurch liable to David Robertson and Daniel Rodni for defamation per se and intentional infliction of emotional distress. In response to a special interrogatory requiring clear and convincing evidence, the jury separately found that Defendant acted with malice, oppression, or fraud toward each Plaintiff. (Verdict Form, Doc. 112, PageID #: 820, 823, Questions 7, 14.) Defendant now asks this Court to set that verdict aside. But Rule 50(b) does not give a losing party a second trial before a judge. The Court must view the entire record in the light most favorable to Plaintiffs, draw every reasonable inference in their favor, and disregard evidence favorable to Defendant that the jury was not required to credit. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). Measured against that standard, the verdict rests on a legally sufficient evidentiary basis on every element of every claim.

Defendant's motion also reaches beyond what Rule 50(b) permits in one respect. A renewed motion "is only a renewal of the preverdict motion," and "can be granted only on grounds advanced in the preverdict motion." *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 780 (6th Cir. 2020) (quoting *Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 328 (6th Cir. 2017)). By Defendant's own account of what he preserved, his Rule 50(a) motion argued that "on defamation, they haven't presented in our opinion sufficient evidence about falsity and privilege." (Trial Tr. Vol. 3, Doc. 121, at 78:10–12, PageID #: 1341.) Section IV.B's opinion-and-hyperbole theory falls within that preserved privilege ground; Plaintiffs address it on the merits below. Defendant's newly minted contention that Daniel Rodni's claims fail "independently" of David Robertson's is a different matter. It appears nowhere in Defendant's own account of the grounds he preserved (Doc. 118 at 1, PageID #: 942) or anywhere in the trial record; Defendant raises it for the first time after the verdict; and *Hanover* forecloses it.

For the reasons below, the motion should be denied in its entirety. In the alternative, any remittitur should be modest and should respect the distinct, non-duplicative categories of harm the jury was instructed to compensate.

## II. LEGAL STANDARD

### A. Rule 50(b) Requires Extreme Deference to the Verdict.

Judgment as a matter of law is appropriate only where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on an issue. Fed. R. Civ. P. 50(a)(1). In deciding a renewed motion, the Court must review the entire record, but it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe" and must credit the evidence favoring the nonmovant, along with any evidence favoring the movant that is uncontradicted and unimpeached. *Id.* at 151. Defendant's motion, at nearly every turn, asks the Court to credit his version of contested facts -- his subjective belief, his reliance on "publicly available material," his supposed generosity in offering a reward and donating money -- over the contrary evidence and inferences the jury was entitled to draw. That is not a Rule 50(b) argument; it is the closing argument the jury already heard and rejected.

### B. A Renewed Motion Cannot Expand the Grounds Raised Before the Case Went to the Jury.

Rule 50(a) motions must be made "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). The Sixth Circuit has squarely held that this requirement admits of no exception for purely legal arguments: "We therefore see no reason to create an exception for questions of law to Rule 50's requirement that a Rule 50(a) motion must precede a Rule 50(b)

motion." *Hanover*, 974 F.3d at 789. That is because a renewed motion "is only a renewal of the preverdict motion," and "can be granted only on grounds advanced in the preverdict motion." *Id.* at 780 (quoting *Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 328 (6th Cir. 2017)). This rule protects the non-movant's Seventh Amendment right to a jury trial by requiring the movant to raise "important issues before the case is submitted to the jury," giving the opposing party notice of any deficiencies in its case while there is still time to cure them. *Id.* at 780 (quoting *Kay*, 709 F. App'x at 328).

One consequence follows. Defendant's newly framed argument that Daniel Rodni's claims fail "independently" of David Robertson's (Section IV.E) never came before the trial court as its own basis for relief; Defendant's own account of his preserved grounds does not distinguish between the two Plaintiffs at all, and nothing in the trial record does either. (Doc. 118 at 1, PageID #: 942.) The Court should decline to consider that argument on that basis alone. Out of an abundance of caution, however, Plaintiffs also address it on the merits below, in Section III.E, and show that it fails there as well.

## III. ARGUMENT

### A. A Reasonable Jury Could Find the Statements Were "Of and Concerning" Both Plaintiffs.

The requirement that a defamatory statement be "of and concerning" the plaintiff is satisfied where a reasonable recipient would understand the statement to refer to the plaintiff; the plaintiff need not be named, and no witness need testify to a specific, subjective act of identification. *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042–46 (1986) (a defamation plaintiff "need not be mentioned by name, but may be identified by clear implication"). The jury was so instructed. Element two of the defamation per se charge required Plaintiffs to prove "that these people reasonably understood that the statements were about Mr. Robertson or Mr. Rodni" (Trial Tr. Vol. 5, Doc. 126, at 88:2–4, PageID #: 1712), and the charge separately instructed that "a statement directed at a small, identifiable group is reasonably understood to apply to each individual member of that group," and that "a family constitutes a sufficiently small group" (*id.* at 89:5–8, PageID #: 1713). Defendant does not identify either instruction as erroneous in his own motion. Under California law, "[t]here is no requirement that the person defamed be mentioned by name ... It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff ... [or] if the publication points to the plaintiff by description or circumstances tending to identify him." *Yow v. National Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1184 (E.D. Cal. 2008); see also *Mullins v. Brando*, 91 Cal. Rptr. 796, 805 n.13 (Cal. Ct. App. 1970) ("When the group becomes smaller than [twenty-five persons], as in the case of a jury, a *family*, an election board, or the four officers of an association, *the courts have been willing to permit the conclusion that the finger of defamation is pointed at each individual*.") (Emphasis added.)

The trial record gave the jury ample, non-hearsay basis to find that reasonable viewers understood the challenged statements to refer to Mr. Robertson and Mr. Rodni specifically, not to an abstraction. Mr. Robertson testified, under oath, that his daughter Lindsey is Kiely's mother, making him Kiely's grandfather by blood. (Trial Tr. Vol. 2, Doc. 120, at 99:2–8, PageID #: 1150.) Mr. Rodni likewise testified that he was Kiely's father and that Kiely was his only child. (*Id.* at 190:17–20, PageID #: 1241.) Kiely's own last words to her grandfather -- "I love you, Grandpa" (*id.* at 99:12–14, PageID #: 1150) -- match that testimony, anchoring the term "Grandpa" to the same real, identifiable, 74-year-old man who personally searched for his granddaughter for two weeks, digging under logs and flipping over rocks. (*Id.* at 195, PageID #: 1246.) Against that backdrop, the jury was entitled to find that Defendant's on-camera references to "the grandpa," "the dad," and "the family" -- delivered in the same videos, in the same breath, as his statements about Kiely -- carried their sting to the two men the public already understood, and the record independently proved, to occupy those roles.

The third pleaded statement makes the same point using the word "grandpa" itself. The jury was read that statement too, as part of the same charge: "Callie Ross' dad is fake Kiely Rodni's grandpa. So if you look at Kiely and look at her situation and who's around her, look at the, air quotes, grandpa, because the grandpa on Kiely's page is the dad on Callie's page." (Trial Tr. Vol. 5, Doc. 126, at 87:13–17, PageID #: 1711.) The video underlying that statement did not leave "grandpa" to the imagination: it displayed an image of Mr. Robertson himself, captioned, in Defendant's own words, "in fake quotes" as Kiely's grandpa. (Opening Statement, Trial Tr. Vol. 1A, Doc. 117, at 22:21–23, PageID #: 853.)

The fourth pleaded statement removes any doubt that reasonable viewers understood these statements to identify Mr. Robertson and Mr. Rodni specifically. The jury was read that statement

verbatim as part of the charge: "I would not say this unless I was 100 percent confident. Kiely Rodni's grandfather is not real. Her dad is not real." (Trial Tr. Vol. 5, Doc. 126, at 87:18–20, PageID #: 1711.) That statement does not gesture at an abstraction -- it invokes the two roles, "grandfather" and "dad," that the record already tied to real, identified men, not to strangers Defendant might plausibly have meant.

The inference that real viewers understood Defendant's statements to name actual, identifiable people -- not abstractions -- is not speculative; it is exactly what happened to non-party Callie Ross, whom Defendant separately accused, on camera, of secretly being Kiely Rodni. Real viewers did not treat that as hyperbole. Ms. Ross testified that she received messages insisting she was "Kiely Rodni" and telling her to "stop lying," and that law enforcement came to her home and called her workplace to investigate. (Trial Tr. Vol. 2, Doc. 120, at 84:15–85:6, PageID #: 1135–1136.) A jury that heard how literally Defendant's audience took his accusations about Ms. Ross could reasonably conclude that the same audience understood his repeated references to "the grandpa" and "the dad" of the missing girl to mean the actual grandfather and father whose public search for her had itself become part of the story.

Defendant's argument that Mr. Robertson "disclaimed" any interest in the GoFundMe misses the point of the claim. Plaintiffs' theory was never that Defendant defamed them by falsely calling them beneficiaries of a real charity; it was that Defendant's accusation that the family was running a "scam to get GoFundMe money" and "catfishing people with internet deaths" accused the identifiable men associated with that effort of fraud -- and "scam" is itself defamatory, holding the accused "up to public hatred, contempt, or ridicule for perpetrating a 'scam' . . . on behalf of a grieving family." *See Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 834 (M.D. Tenn. 2021). Mr. Robertson testified that he personally asked Defendant to stop -- "Ryan Upchurch,

please stop. You're hurting my family" -- and received no response, only pressure from Defendant's own fan base to back off. (Trial Tr. Vol. 2, Doc. 120, at 121:8–15, PageID #: 1172.) A jury crediting that testimony, and evidence that Defendant kept making new videos repeating the same accusations well past the four statements pleaded -- including, as Defendant's own motion acknowledges, additional "CGI," "AI," and "bullshit family" statements in October and November 2025 -- misdated as "2023" in Defendant's own motion (Doc. 118 at 16, PageID #: 957) -- could reasonably infer that Defendant's own viewers, and Defendant himself, understood exactly whom "the family" meant. This is exactly the kind of question a jury decides, and *Reeves* forecloses revisiting it here.

**B. The Opinion/Hyperbole Argument Fails on the Merits.**

The controlling Supreme Court precedent of *Milkovich v. Lorain Journal Co.* did not create a broad constitutional exemption for anything labeled opinion; it held that a statement implying a false assertion of fact remains actionable even when framed as opinion, and that the dispositive question is whether a reasonable reader could understand the statement as making a factual assertion about the plaintiff. 497 U.S. 1, 20-21 (1990). The jury here was instructed precisely along those lines: to prevail, Plaintiffs had to prove Defendant's statements "must have been statements of fact, not opinion," that "a statement of fact is one that can be proved to be true or false," and that they "may recover if a statement phrased as an opinion implies that a false statement of fact is true." (Trial Tr. Vol. 5, Doc. 126, at 88:19–25, PageID #: 1712.) Mr. Robertson's and Mr. Rodni's own sworn testimony established, as verifiable fact rather than opinion, that Mr. Robertson is Kiely's grandfather through his daughter Lindsey, Kiely's mother, and that Mr. Rodni is Kiely's father. (Trial Tr. Vol. 2, Doc. 120, at 99:2–8, PageID #: 1150; *id.* at 190:17–20, PageID #: 1241; see also Section III.A above.) The jury's liability verdict necessarily means it found the

four statements were fact, not opinion, and that Plaintiffs proved them false, under that instruction -- an instruction Defendant does not challenge in his motion.

The Sixth Circuit applies *Milkovich* the same way, holding that "a viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts." *Sandmann v. New York Times Co.*, 78 F.4th 319, 332 (6th Cir. 2023) (quoting *Compuware Corp. v. Moody's Inv. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007)). The Supreme Court has likewise rejected any "wholesale defamation exemption for anything that might be labeled 'opinion,'" because "expressions of 'opinion' may often imply an assertion of objective fact." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (quoting *Milkovich*). As *Milkovich* itself illustrated, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth[;] . . . [s]imply couching such statements in terms of opinion does not dispel these implications." *Milkovich*, 497 U.S. at 18–19. Courts weigh (1) the common usage of the words -- whether they are commonly understood as loose, figurative, or hyperbolic; (2) whether the statement is objectively verifiable; (3) the immediate context; and (4) the broader social context. *See Jolliff v. NLRB*, 513 F.3d 600, 611–12 (6th Cir. 2008). Every factor here cuts against Defendant: "I would not say this unless I was 100% confident" and "Kiely Rodni is not real . . . her dad is not real" are not the loose, figurative language of a heated argument -- they are declarations of verifiable fact, expressly offered with proof to come, directed at the specific, immediate context of a missing child's family, and delivered to millions of viewers who, as Ms. Ross's experience shows, treated them as literally true.

Nor does the YouTube setting rescue Defendant's statements. Courts have specifically rejected the argument that online speech should be read as protected hyperbole simply because

"online posters often play fast and loose with facts"; that reputation for looseness does not render online commentators "immune from defamation liability." *Sanders v. Walsh*, 162 Cal. Rptr. 3d 188, 196 (Cal. Ct. App. 2013). Where, as here, a defendant makes "specific factual claims" rather than "vague implications," the medium does not launder them into opinion. *Id. Milkovich* itself arose from an opinion column on a newspaper's sports page -- a forum the state court thought was "a traditional haven for cajoling, invective, and hyperbole" -- and the Supreme Court reversed anyway. *Milkovich*, 497 U.S. at 9, 18–19. A YouTube channel is no more of a hyperbole-only zone than a sports column.

Real viewers did not receive Defendant's accusations as colorful commentary -- they acted on them as fact. The same jury that considered the four pleaded statements also heard Callie Ross describe people messaging her that she was "Kiely Rodni" and demanding she "stop lying," and law enforcement visiting her home over an accusation Defendant delivered in exactly the same on-camera register -- "100 percent confident" -- as the "not real" statements about Mr. Robertson and Mr. Rodni. (Trial Tr. Vol. 2, Doc. 120, at 82:17–85:6, PageID #: 1133–1136.) Ms. Ross asked Defendant directly to take the video down because it was untrue, and he never responded. (*Id.* at 85:7–11, PageID #: 1136.) A jury could reasonably find that Defendant's own audience -- the very people his statements were designed to reach -- understood his "100 percent confident" framing as a factual claim capable of being believed, verified, or acted upon, not as rhetorical hyperbole. That a defendant chooses profane, informal language does not immunize a factual accusation of fraud or identity fabrication delivered in that vernacular; it only means the jury, not the speaker, decides how the statement actually landed. The jury decided that question against Defendant, on a full record, and *Reeves* forecloses second-guessing it now.

### C. The Jury's Clear-and-Convincing Malice Finding Is Supported by the Record.

Defendant does not merely ask the Court to find no evidence; he asks it to override explicit jury findings made under the very instruction Defendant's motion quotes. The jury was instructed that it could find presumed damages only if Plaintiffs proved "by clear and convincing evidence that Mr. Upchurch knew the statements were false and that he had serious doubts about the truth of the statements." (Trial Tr. Vol. 5, Doc. 126, at 91:12–19, PageID #: 1715.) In awarding assumed damages to both Plaintiffs (Verdict Form, Doc. 112, PageID #: 820, 822, Questions 3, 10), the jury necessarily made that finding. It then went further: in response to special interrogatories separately requiring clear and convincing evidence, the jury found that Defendant "acted with malice, oppression, or fraud" toward both Mr. Rodni and Mr. Robertson. (*Id.*, Questions 7, 14.) *Reeves* requires the Court to credit both findings unless no reasonable jury could have reached them.

Defendant's argument that he was merely wrong, not reckless, ignores the standard for proving reckless disregard circumstantially. *Harte-Hanks Communications, Inc. v. Connaughton* holds that a factfinder may infer actual malice from a defendant's failure to investigate obvious reasons for doubt or reliance on sources the defendant had reason to question. 491 U.S. 657, 668, 692 (1989). The jury heard that Defendant repeatedly and publicly declared himself "100 percent confident" in accusations built from other creators' screenshots and speculation rather than firsthand knowledge; that he kept making new videos repeating the same accusations for well over a year, including the additional statements Defendant's own motion identifies from October and November 2025 (Doc. 118 at 16, PageID #: 957); that Mr. Robertson's direct, public request that Defendant stop -- "you're hurting my family" -- went unanswered while Defendant's fans mobilized against Mr. Robertson instead (Trial Tr. Vol. 2, Doc. 120, at 121:8–15, PageID #: 1172); and that a similar request from Callie Ross to remove a video accusing her of impersonating a dead teenager also went unanswered (*id.* at 85:7–11, PageID #: 1136). A jury crediting that evidence --

as it plainly did -- could reasonably find that Defendant's "100 percent confident" framing reflected not sincere, careful belief but a subjective awareness that he could not verify what he was telling millions of viewers. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (actual malice may be found where a speaker "entertained serious doubts as to the truth of his publication").

Defendant's fallback -- that his reward pledge and livestream prayer negate malice, oppression, or fraud (Doc. 118 at 4, 17, PageID #: 945, 958) -- does not survive his own cross-examination. Confronted with his prior deposition testimony, Defendant admitted that the point of pledging the Hellcat and $100,000 was not compassion for a grieving family but vindication of his own "not real" theory: "No, I think I said it would prove what I was saying was credible, and it did." (Trial Tr. Vol. 4, Doc. 122, at 193:12–14, PageID #: 1588.) Moments earlier, confronted with that same deposition testimony, he had tried to recast the reward as being "for leads to find whoever this girl is" (*id.* at 193:4, PageID #: 1588) -- still hedging, mid-trial, on whether Kiely was real. He also conceded he paid reluctantly, not generously: "nobody wants to give a hundred-thousand dollars and a Hellcat away." (*Id.* at 192:9–10, PageID #: 1587.) The livestream prayer fares no better. Confronted with video of himself praying for Kiely's family, Defendant testified that he did it only because he "was put on the spot" on "someone else's channel" and "didn't want to be disrespectful to her" -- not because he believed it. (*Id.* at 169:23–25, PageID #: 1564-1565.) Pressed on whether he meant the prayer, he could not commit: "Well, of course if I pray to God, I mean it. And my opinion of things can fluctuate. I don't know answers to everything ... At that time, possibly I was giving it the benefit of the doubt." (*Id.* at 170:13–18, PageID #: 1565.) A jury hearing that testimony -- a reward pledged to validate the same falsehood underlying this suit, paid reluctantly, and a prayer Defendant could not affirm he meant -- could reasonably conclude that these were self-serving gestures, not good-faith conduct that undercuts the malice the jury found.

### D. The Intentional Infliction Claim Rests on Targeted, Individualized Conduct That *Snyder* Does Not Immunize.

*Snyder v. Phelps* constitutionalized limits on IIED liability for the Westboro picketers' generalized signage on matters of public concern, displayed at a distance from a funeral the picketers otherwise had no connection to. 562 U.S. 443, 451–52, 458–60 (2011). It did not hold that a speaker who levels repeated, targeted, individualized accusations of fraud and false identity against specific, identifiable private people -- and continues after those people personally ask him to stop -- is immune from liability merely because the broader subject he is discussing is newsworthy. Courts routinely allow an intentional-infliction claim to proceed on "the entire range" of a defendant's online conduct toward the plaintiff, rather than crediting a defense built around any single statement. *See Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234, 257–58 (Cal. Ct. App. 2017) (IIED claim survived on the defendant's course of conduct, including posting the plaintiff's address and prompting fans to appear there, though the related defamation claim failed). The parallel to Mr. Robertson's own experience, discussed below, is direct.

The jury heard that Defendant kept making new videos repeating the same handful of accusations about "the family" for well over a year, including the further October and November 2025 statements Defendant's own motion describes (Doc. 118 at 16, PageID #: 957); that he had no relationship of any kind with either Plaintiff; and that he continued after Mr. Robertson personally and publicly asked him to stop because it was "hurting my family," a request that went unanswered while Defendant's own fan base mobilized against Mr. Robertson instead. (Trial Tr. Vol. 2, Doc. 120, at 121:8–15, PageID #: 1172.) A reasonable jury could find that conduct crossed the line the Court's instruction drew: outrageous conduct "goes beyond all possible bounds of decency" and "does not include trivialities such as indignities, annoyances, hurt feelings or bad manners that a reasonable person is expected to endure." (Trial Tr. Vol. 5, Doc. 126, at 89:25–

90:6, PageID #: 1713–1714.) Mr. Robertson's own testimony tracks that community standard. When defense counsel pressed him to agree that online commentary is unregulated -- "kind of like the wild wild west in terms of what people can say" -- he disagreed: "I think that the wild wild west is long gone, and we live in a civilized society today." (Trial Tr. Vol. 2, Doc. 120, at 153:8–9, PageID #: 1204.) The same instruction told the jury it could consider "whether Mr. Upchurch knew that Mr. Robertson or Mr. Rodni was particularly vulnerable to emotional distress" and "whether Mr. Upchurch knew that his conduct would likely result in harm." (*Id.* at 90:9–12, PageID #: 1714.) A jury could reasonably find both satisfied here, particularly where the record shows Defendant's audience, spurred by his own commentary, escalated against Mr. Robertson in response to his request that Defendant stop.

On causation, the record includes more than speculation. Daniel Rodni's treating clinician's own contemporaneous record, admitted without objection as Plaintiffs' Exhibit 62A, states that he "continues to fear for his safety and that of those around him due to threats from the online community related to Ryan Upchurch," and that he had "disappeared for that reason." (Trial Tr. Vol. 2, Doc. 120, at 209:9–12, PageID #: 1260.) Mr. Rodni testified, without contradiction, that he never discussed any other YouTuber with that clinician and that no other YouTuber caused him this fear. (*Id.* at 209:13–18, PageID #: 1260.) That is a treating provider's contemporaneous record identifying Defendant, by name, as the cause -- precisely the kind of "substantial factor" evidence the standard requires, despite the other stressors Defendant catalogs.

**E. Daniel Rodni's Claims Rest on a Developed, Independent Record.**

Defendant's characterization of the record for Daniel Rodni as "nearly empty" ignores what the jury actually heard. Mr. Rodni testified that he began receiving daily therapy within days of Kiely's disappearance and continued in weekly treatment for months. (Trial Tr. Vol. 2, Doc.

120, at 199:25–200:15, PageID #: 1250–1251.) Once he learned of Defendant's videos, he sought ongoing psychiatric care from a treating clinician, Katina Varzos, who administered a PTSD screening and treated him for the result. (*Id.* at 207:22–208:14, PageID #: 1258–1259.) Ms. Varzos's own medical record, admitted without objection as Plaintiffs' Exhibit 62A, documents that Mr. Rodni "continues to fear for his safety and that of those around him due to threats from the online community related to Ryan Upchurch." (*Id.* at 209:9–12, PageID #: 1260.) Mr. Rodni testified, without contradiction, that he never discussed any other YouTuber with his treating clinician and that no other YouTuber caused him this fear. (*Id.* at 209:13–18, PageID #: 1260.) That is contemporaneous clinical evidence of a diagnosed condition causally tied to Defendant specifically -- not the evidentiary void Defendant describes.

Defendant's own conduct corroborates that fear. Mr. Rodni testified that Defendant posted a video zooming in on his house on Google Earth (Plaintiffs' Exhibit 22), and that his reaction was fear -- "[p]eople are looking for me now" -- particularly because he lived in a small community where, in his words, "it would be very easy to find me." (Trial Tr. Vol. 2, Doc. 120, at 201:12–202:6, PageID #: 1252–1253.) Defendant posted that video on September 1, 2022 -- ten days after Kiely was found, and, as Mr. Rodni testified without contradiction, the same day as both Kiely's birthday and the day she was cremated. (*Id.* at 207:4–5, 210:1–6, PageID #: 1258, 1261.) A jury could reasonably find that timing -- whether or not deliberately chosen -- compounded the outrage and distress of conduct the jury was already entitled to find extreme.

That fear translated into concrete, physical safety measures, not vague unease. Mr. Rodni testified on direct examination that after these videos he bought multiple security cameras and a security system and that, in his own words, "at that point, I had slept with a pistol under my -- under my pillow." (Trial Tr. Vol. 2, Doc. 120, at 203:4–5, PageID #: 1254.) He ultimately moved

away from the home entirely, explaining that "it's just not safe" -- not only for himself but for neighbors, including "the poor child that lived across the street," who might otherwise be endangered by someone looking for him. (*Id.* at 203:7–11, PageID #: 1254.) That is not generalized anxiety; it is the specific, physical toll of Defendant's targeted conduct on one identifiable man.

As to identification, the jury could draw the same reasonable inference discussed in Section III.A: Mr. Rodni was Kiely's dad and Defendant's own statements linked "the dad" to the same family GoFundMe and identity accusations he leveled throughout his commentary. A jury could reasonably conclude that a reasonable viewer would have understood "the dad" to mean Daniel Rodni just as readily as it understood "the grandpa" to mean David Robertson.

## F. The Jury Instructions, Considered as a Whole, Fairly Stated the Law.

A new trial for instructional error requires more than a preference for different wording. Jury instructions "are reviewed as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision." *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1010–11 (6th Cir. 1987). "A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir. 1990) (quoting *Kitchen*, 825 F.2d at 1010–11); accord *Stockenhauer v. Sigman*, No. 97-CV-70619-DT, 2005 WL 2346294, at *4 (E.D. Mich. Sept. 24, 2005) (same standard, quoting *Beard*).

The certified charge-conference transcript refutes, rather than supports, Defendant's premise that the charge was rushed or abbreviated. Defendant asked the Court to restate the elements directly on the verdict form itself rather than in the jury charge; the Court explained that jurors would have the full charge in hand during deliberations, that a longer form created a greater risk of the very confusion Defendant said he wanted to avoid, and declined to make the change:

"if that's the only objection to the verdict form, then we'll leave it as is." (Trial Tr. Vol. 4, Doc. 122, at 14:11–16:11, PageID #: 1409–1411.) When Defendant asked the Court to insert "about them" into the charge's introductory description of "numerous YouTube videos containing defamatory statements," the Court considered it, heard Plaintiffs' objection, and again declined, explaining that the operative element -- requiring the jury to find the statements were reasonably understood to be about Mr. Robertson and Mr. Rodni specifically -- already appeared "the very next page," and that the introductory sentence was "just framing it." (*Id.* at 19:1–20:1, PageID #: 1414–1415.) When Defendant asked, for the first time at the conference, to rewrite the defamatory-meaning element to add libel/slander-specific statutory language, the Court pressed him on why this proposal was not in the instructions he had filed two weeks before trial, and ultimately declined it: "I'm going to keep the way it's drafted here because if you look at pattern instruction 1702, it says 'insert grounds for defamation,' and these are specifically tied back to the allegedly defamatory statements identified by plaintiffs." (*Id.* at 43:11–46:21, PageID #: 1438–1441.) The Court likewise declined Defendant's eleventh-hour requests to add the word "provably" before "false," to add a stand-alone "not privileged" element, and to add "extreme and" to the intentional-infliction instruction, each because none appeared in what Defendant had proposed before trial. (*Id.* at 47:7–48:22, PageID #: 1442–1443.) Defendant lodged no objection at all to the damages instructions, the general instructions, or the final verdict form. (*Id.* at 49:9–51:9, PageID #: 1444–1446.) A charge that the trial court built by holding both sides to their own pretrial submissions, and by explaining on the record exactly why each of Defendant's late-breaking changes was unnecessary or untimely, is not a charge that permitted the jury to bypass the required elements. Defendant does not identify a single specific instruction he asked for and was refused that he now

claims constituted reversible error; he simply relitigates requests the trial court already considered and rejected for reasons stated on the record.

### G. The Admission of Additional Videos Was Not an Abuse of Discretion, and Any Error Was Harmless.

Courts review evidentiary rulings for abuse of discretion, and subject any error to harmless-error review under Rule 61, which places the burden on Defendant to show that the outcome would have differed absent the challenged evidence. Defendant does not carry that burden by observing that the additional videos were unflattering. The trial court gave a contemporaneous limiting instruction confining the jury's use of that material to context for the four pleaded statements -- the kind of instruction courts routinely rely upon to find no abuse of discretion -- and Defendant offers nothing beyond the size of the verdict to suggest the jury disregarded it. *Reeves* requires the opposite assumption: that the jury followed its instructions. Nor was the material irrelevant. Defendant's continuing course of videos repeating the same accusations, made after Mr. Robertson asked him to stop, is itself probative of the intentionality the trial court identified when it denied Defendant's first Rule 50(a) motion at the close of Plaintiffs' proof (Trial Tr. Vol. 3, Doc. 121, at 84:16–21, PageID #: 1347), and of the actual-malice and causation issues addressed in Sections III.C and III.D above.

### H. The Compensatory Award Rests on Three Distinct, Well-Supported Categories of Harm, and Any Remittitur Should Be Modest.

The jury's award rests on three separate, non-duplicative categories that the Court's own instructions distinguished: actual defamation damages tied to proven reputational harm, assumed damages for the presumed harm defamation per se recognizes without separate proof, and intentional-infliction damages for the distinct emotional-distress injury that Mr. Rodni's and Mr. Robertson's own testimony and clinical records documented. The jury was expressly instructed

that "each item of damages may be awarded only once, regardless of the number of legal theories alleged," and that if "the same harm was caused by both defamation per se and intentional infliction of emotional distress," it "must not award separate amounts for the same harm under each legal theory" but instead "determine a single amount." (Trial Tr. Vol. 5, Doc. 126, at 93:1–12, PageID #: 1717.) Defendant's "double recovery" argument assumes the jury disregarded that instruction; *Reeves* forecloses that assumption absent some affirmative indication the jury did so, and Defendant identifies none.

The certified instructions confirm the categories are not duplicative, and Defendant's own characterization of the verdict shows exactly what each category compensated. A plaintiff recovers actual damages only by proving, as a substantial factor, out-of-pocket expense or "harm to his reputation, or shame, mortification or hurt feelings." Assumed damages require an independent, heightened showing -- clear and convincing proof that Defendant "knew the statements were false" or "had serious doubts about the truth of the statements" -- and only then, "the law assumes that the man's reputation has been harmed and that he has suffered, shame, mortification, or hurt feelings," entitling him "to receive compensation for this assumed harm in whatever sum you believe is reasonable," subject only to a nominal floor: "at least a nominal sum, such as one dollar." (Trial Tr. Vol. 5, Doc. 126, at 91:5–24, PageID #: 1715.) Defendant's argument treats that floor as a target; the instruction makes it a minimum, and leaves the reasonable amount above it to the jury. Intentional-infliction damages require a third, independent showing: outrageous conduct causing emotional distress that is "not mild or brief" but "so substantial or long lasting that no reasonable person in a civilized society should be expected to bear it." (*Id.* at 90:20–25, PageID #: 1714.) Three elements, three burdens of proof, three sums: $500,000 actual, $2,000,000 assumed, and $4,000,000 IIED damages for Daniel Rodni ($6,500,000 in all); $1,000,000 actual, $4,000,000

assumed, and $6,000,000 IIED damages for David Robertson ($11,000,000 in all). (Doc. 118 at 6, PageID #: 947; Verdict Form, Doc. 112, PageID #: 820–823, Questions 2–3, 5, 9–10, 12; Judgment, Doc. 116, PageID #: 831.) That is not three labels on one injury -- it is compensation for three injuries the jury was told to keep separate and, on this record, did.

Defendant's suggestion that the award reflects "audience size" rather than proven harm both misstates the law and ignores the specific evidence tying each award to Defendant by name. Reach is not irrelevant to reputational injury: a falsehood that reaches millions of viewers is not the same reputational event as one that reaches a handful, and a jury may permissibly credit that difference in valuing assumed harm to reputation. But neither award here is a free-floating estimate of subscriber counts. Mr. Rodni's treating clinician's own contemporaneous record, admitted without objection, documents that he "continues to fear for his safety and that of those around him due to threats from the online community related to Ryan Upchurch." (Trial Tr. Vol. 2, Doc. 120, at 209:9–12, PageID #: 1260.) Mr. Robertson testified that after Defendant kept airing the same accusations, a member of Defendant's self-described "Creek Squad" -- shown on camera alongside Defendant in one of the same videos played for the jury -- warned that if "you mess with Ryan Upchurch or the Creek Squad, it's lights out"; that Mr. Robertson found the warning credible enough to report to the Nevada County Sheriff's Department; and that, when defense counsel suggested on cross-examination that he had "no affirmative actual knowledge" the speaker acted on Defendant's behalf, Mr. Robertson disagreed and explained: "Sounds like a threat to me. Probably a nonsense threat, but certainly enough to concern me enough to contact the authorities." (*Id.* at 118:10–23, 150:9–24, PageID #: 1169, 1201.) That is direct, individualized evidence of harm Defendant's continued targeting caused -- not an inference from view counts.

The same mechanism is corroborated elsewhere in the record. As detailed in Section III.B, Callie Ross testified that real viewers messaged her demanding she "stop lying" and calling her "Kiely Rodni." (Trial Tr. Vol. 2, Doc. 120, at 82:17–85:6, PageID #: 1133–1136.) A jury could reasonably infer that the same mechanism operated against Mr. Robertson and Mr. Rodni: viewers who received Defendant's "100 percent confident" accusations as fact, not rhetoric, credited them the same way Ms. Ross's accusers did. Defendant's premise that no one "thought less" of either man is an argument he was entitled to make to the jury -- and did -- not a basis to override the jury's rejection of it.

Defendant's assertion that the verdict "reflects passion and prejudice" (Doc. 118 at 17, PageID #: 958) invokes the right label but skips the required showing. A jury's damages award "must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." *Wallace v. FedEx Corp.*, 764 F.3d 571, 593 (6th Cir. 2014) (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 443 (6th Cir. 2000)). A court may remit a verdict only when, after reviewing the evidence in the light most favorable to the prevailing party, it is "convinced that the verdict is clearly excessive[;] resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the judicial conscience," and even then it "may not substitute its judgment or credibility determinations for those of the jury." *Id.* (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). A court abuses its discretion by remitting a verdict that "turns upon conflicting evidence and the credibility of witnesses." *Id.* Defendant does not carry that burden merely by repeating the word "passion"; he identifies no improper argument to the jury and no evidentiary basis for the claim beyond his own characterization of the award as large. That is the same unsupported assertion federal courts routinely reject. *See Lloyd v. Greater Cleveland Reg'l Transit Auth.*, No. 1:18-cv-01557, 2022 WL

1028121, at *3 (N.D. Ohio Apr. 6, 2022) (denying remittitur where the moving party "offers no argument, and cites to no evidence to support any argument, regarding the possibility that the jury's verdict may have been the result of sympathy, passion, and/or bias or that the damages shock the conscience").

Even if the Court concluded some adjustment were warranted, the remedy is not simply to enter a smaller judgment. Remittitur requires offering Plaintiffs the choice between the reduced amount and a new trial; a court that unilaterally imposes a lower figure commits reversible error. *Wallace*, 764 F.3d at 592 (citing *Farber*, 917 F.2d at 1396). If that choice is ever reached, the settled remittitur practice is to reduce an award only to the highest amount the evidence can sustain, not to substitute the Court's own valuation of non-economic harm for the jury's -- the factfinding role *Reeves* and the Seventh Amendment reserve to the jury on contested questions like these. Nor is it a defect that the two totals differ: the jury heard different, individualized proof for each man, including the corroborated threat evidence unique to Mr. Robertson, and was free to value each man's harm on his own record. The punitive component raises no separate constitutional concern: due process is most likely to be implicated by punitive awards that are many multiples of the compensatory award, not a small fraction of it. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (single-digit ratios between punitive and compensatory damages are far more likely to comport with due process than higher ratios). Here, the jury's combined $500,000 punitive award is roughly three percent of the $17,500,000 compensatory award -- a ratio far below any that has ever raised constitutional concern -- and follows directly from the jury's clear-and-convincing finding of malice, oppression, or fraud. (Verdict Form, Doc. 112, PageID #: 821, 823, Questions 7, 14; Phase 2 Verdict Form, Doc. 114, PageID #: 826; Judgment, Doc. 116, PageID #: 831.)

## IV. CONCLUSION

Defendant's motion should be denied in its entirety. The jury weighed the evidence, honored the Court's instructions, and returned a verdict holding the Defendant accountable for his campaign of harassment and lies as he weaponized his substantial online platform to target a grieving family. The First Amendment does not protect this kind of misconduct. To the contrary:

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty."

*Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring).

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent via the Court's ECF system to the following parties on July 31, 2026, to:

Dennis Disney

dennis@shrumdisney.com

Barry Shrum

barry@shrumdisney.com

*/s/ Christopher Smith*